SUPREME COURT OF ARIZONA
En Banc

STATE OF ARIZONA,                  )    Supreme Court
                                   )    No. CR-97-0317-AP
                    Appellee,      )
   vs.                             )    Maricopa County
                                   )    No. CR-92-05731
SCOTT ALAN LEHR,                   )
                                   )    O P I N I O N
                    Appellant.     )
_____)

Appeal from the Superior Court of Maricopa County
The Honorable Stephen A. Gerst, Judge

AFFIRMED IN PART
REVERSED IN PART
REMANDED

_____

Janet A. Napolitano, Arizona Attorney General        Phoenix
     By    Paul J. McMurdie, Former Chief Counsel,
              Criminal Appeals Section
           Kent E. Cattani, Chief Counsel,
              Capital Litigation Section
           Colleen L. French, Deputy Maricopa County Attorney
              (Former Assistant Attorney General)
Attorneys for Appellee

Lisa Marie Martin                                    Phoenix
Attorney for Appellant

_____

Z L A K E T, Justice.

¶1      Scott Alan Lehr appeals from his convictions and
sentences on three counts of first degree murder, three counts of
attempted first degree murder, two counts of aggravated assault,
seven counts of kidnapping, thirteen counts of sexual assault, one

count of attempted sexual assault, four counts of sexual conduct with a minor, and four counts of sexual assault with a child under the age of fourteen years. We have jurisdiction pursuant to Arizona Constitution article VI, section 5(3), Arizona Rules of Criminal Procedure 26.15, 31.2(b), and Arizona Revised Statutes section 13-4031.

## I. FACTS

¶2        The charges against the defendant stem from separate attacks upon ten different women over the course of approximately one year. They are as follows:

### A. W.C.[1]

¶3        On the afternoon of February 13, 1991, W.C. was forty-eight years old. She stood four feet eleven inches tall, and weighed ninety pounds. W.C. was walking near 27th Avenue and Camelback when she accepted a ride from a man in a car. Instead of taking her home, he drove to an area north of the city via the I-17 freeway. At one point during the drive, the man choked her into unconsciousness. She awoke as the car was pulling into the desert. The perpetrator ordered the victim to remove her clothes, which she did. He then forced her to perform oral sex, vaginally raped her, and shoved her into a ravine. The naked victim was later found

---

[1] Given the nature of these crimes, victims are identified by initials in order to protect their privacy and that of their families.

2

walking along a road, wrapped in an old piece of carpet.

¶4      During the subsequent investigation, the victim picked the defendant out of a photographic lineup. At trial, however, she identified as her attacker a man standing in the back of the courtroom who was not the defendant. The crime laboratory of the Department of Public Safety (DPS) found a five-probe match between the defendant's DNA and a sample taken from the victim's vagina.

### B. *T.H.*

¶5      On the afternoon of February 23, 1991, T.H. was eighteen years old, five feet four inches tall, and she weighed approximately one hundred pounds. She was walking on 16th Street between Thomas and McDowell when she accepted a ride from a man in a car. The man agreed to take her to a destination about a mile and a half south. Instead, he drove onto the I-17 freeway heading north. After exiting the freeway at Happy Valley Road, the car drove into the desert and stopped. The perpetrator pulled off T.H.'s clothes and raped her both vaginally and anally. As the victim subsequently exited the vehicle, she got a glimpse of the license plate.[2] The rapist ordered her to run. When she hesitated, he threw a rock that struck her in the chest. He continued to throw rocks at her as she fled. The victim made a

---

[2] The victim testified that the plate began with the letters ADW and ended in either 915 or 515. During the relevant time, the defendant owned a Chevrolet with license plate ADW-015.

3

tentative identification of the defendant at a live lineup,[3] and then positively identified him as her attacker at trial.

### C. *S.G.*

¶6        On the afternoon of March 23, 1991, S.G., thirty-four years old, five feet three inches tall and weighing approximately one hundred five pounds, was waiting for a bus at 16th Street and Glendale.  She accepted a ride from a man who drove north on the I-17 freeway, past Happy Valley Road.  He then went down a dirt road and into the desert.  The perpetrator pulled off S.G.'s clothes and vaginally raped her with his fingers and his penis.  The victim remained in the car and put her clothes back on while the man drove back toward the city.  Upon reaching the end of the dirt road, he said, "This is close enough to civilization. Get out."  She did, and as he drove off she saw part of his license plate.[4]  The victim identified the defendant as her assailant at a live lineup and at trial.

### D. *C.Z.*

¶7        On the afternoon of April 4, 1991, C.Z. was twenty-one years old, four feet eleven inches tall, and she weighed ninety to

---

[3] The victim said she was less than 100% sure that the defendant was her assailant at the live lineup.  At trial, she explained that she did not want to say 100% because at the lineup she "hadn't seen him move or he didn't seem vicious . . . . [She] felt sorry for him."

[4] The victim testified that the license plate contained either the letters ADW or AOW.  *See also* note 2, *supra*.

ninety-five pounds. She was walking near 19th Avenue and Bell Road when she accepted a ride from a man in a car. C.Z. agreed to meet this man's wife to talk about a housekeeping job. The man drove to a dirt road in the desert off of Happy Valley Road. He then told the victim that this was a good place to have sex. When she refused, he choked her. The victim relented and took off her pants at the man's order. The perpetrator pushed up her shirt, fondled her breasts, forced her to perform oral sex, then vaginally raped her. He pulled her out of the car by the neck and she lost consciousness. The attacker then apparently struck her head with or against a rock. C.Z. was ultimately found walking on the freeway, naked except for her socks. Defendant's fingerprint was discovered on a paper cup found at the scene. The victim identified the defendant as her assailant at a live lineup and at trial.

### E. *J.T.*

¶8    On the morning of October 24, 1991, J.T. was thirteen years old, five feet three inches tall, and she weighed one hundred ten pounds. She was walking near 19th Avenue and Union Hills Drive when she was offered a ride to her aunt's house from a man in a car. Her aunt was not home and she accepted an invitation from the man to go meet his family. The man drove up 19th Avenue and into a desert area near Deer Valley Road. He told J.T. that they were "going to have sex." When she tried to escape, he choked her. The

5

victim relented and the man took off her clothes.  He performed oral sex on her, vaginally raped her with his penis, and forced her to perform oral sex on him.  He ordered the victim out of the car, beat her head against the ground, and then choked her into unconsciousness.  DPS found a four-probe match between the defendant's DNA and a sample obtained from the victim's vagina.  The victim identified the defendant as her assailant at a live lineup and at trial.

### F.  *M.C.*

¶9      On November 8, 1991, M.C. was in her mid-thirties and stood five feet four inches tall.  She weighed one hundred fifteen to one hundred twenty pounds.  She was last seen very early in the morning at a convenience store on the corner of 16th Street and Indian School.  Later that day, M.C.'s body was found lying on a dirt road in an orchard near 59th Avenue and Utopia.  Her sweater was unzipped and her bra was pushed up over her breasts.  Her pants were pulled down.  Her skull was fractured on both sides.  There were two blood stained rocks at the scene, one with hair stuck to it.  She had died from blunt force trauma to the head.  Semen was found in her vagina and rectum.  DPS identified a five-probe match between the defendant's DNA and a sample found on the victim.

### G.  *J.A.*

¶10      On the night of November 18, 1991, J.A. was only ten

years old and four feet eight inches tall. She weighed one hundred ten pounds. She was walking near 35th Avenue and Camelback when she accepted a ride from a man in a car. The man drove her to a convenience store, where he bought a soft drink and a bottle of hand lotion. The perpetrator then drove north into the desert near 99th Avenue and Beardsley Road. He removed his trousers and her pants, applied lotion to his penis and her vagina, attempted to penetrate her both vaginally and anally, then forced her to perform oral sex. After he was finished, he left J.A. in the desert. The victim identified the defendant as her attacker at trial.

### H. *B.C.*

¶11    On January 20, 1992, B.C. was twenty-one years old, five feet tall, and she weighed one hundred to one hundred ten pounds. That night she left her apartment at 15th Street and Cave Creek Road, intending to hitchhike to a friend's house near 16th Street and Northern. That was the last time B.C. was seen alive. Her remains were found almost six months later near the Central Arizona Project canal and I-17. The body was severely decomposed; it was missing one arm and both legs. Her skull was fractured in several places. She had died from massive blunt force trauma to the head. At the scene, police found several scattered items, including a sweater, bra, blue jeans, and panties. A forensic anthropologist estimated that the victim had been dead from three to six months. Absence of body fluid on the clothes indicated that they were not

on the body while it decomposed.  A ring, later identified as belonging to the victim, was found in the defendant's home.

### I.  *M.M.*

¶12     On the afternoon of February 7, 1992, M.M. was nineteen years old.  She stood five feet one inch tall and weighed one hundred seven pounds.  She was dropped off at 35th Avenue and Peoria by her roommate.  M.M. was last seen getting into a black truck with a man at a convenience store located on that corner.[5]  Almost two weeks later, her body was discovered in the desert near the Carefree Highway and I-17.  She was wearing only a top, which was pushed up over her breasts.  There was evidence of vaginal bruising.  She had lacerations to her scalp, and her skull was fractured in several places.  A bloody rock was found at the scene.  The victim had died from blunt force trauma to the head. There was semen found in her anus.  DNA testing of the semen was inconclusive, but DPS could not exclude the defendant as a possible donor.

### J.  *E.R.*

¶13     On the night of February 23, 1992, E.R. was fourteen years old, approximately five feet eight inches tall and she weighed between one hundred eighty and two hundred ten pounds.  She

---

[5] Neither the eyewitness description of the truck nor of the man suggested that he was the defendant.

was walking along Indian School Road toward 19th Avenue when she accepted a ride from a man in a car. He drove north out of the city and pulled onto a dirt road near Lake Pleasant. In the car, the perpetrator removed the victim's underwear, forced her to perform oral sex, and vaginally raped her. He then took her out of the car and forced her to perform oral sex again. Afterwards, as E.R. bent to pick up her sweater, she was struck in the head with a heavy object. The next day, she was found wandering near Lake Pleasant. Badly injured, she was wearing only a shirt, a shoe, and a sock. DPS found a five-probe match between the defendant's DNA and a sample taken from the victim's vagina. The victim identified the defendant as her assailant at a live lineup and at trial.

### K. *DEFENDANT'S TESTIMONY*

¶14 During the year in question, the defendant was a tree-trimmer familiar with the desert areas north of Phoenix. He owned two cars, each of which was identified by victims as the vehicle driven by their attacker. Nonetheless, he denied ever meeting any of the victims. He did not offer to explain how his DNA could be linked to four of the women or how his fingerprint was found at the scene of one of the attacks. As for the ring found in his home, he claimed to have bought it at a garage sale. He said that he gave it to his wife for Christmas, prior to the date of B.C.'s death.

## II.  PROCEDURAL HISTORY

¶15      The defense sought to have the proceedings severed into ten separate trials, one for each victim.  Judge Stephen A. Gerst refused, except for counts relating to three of the sexual assaults, which were consolidated for a separate trial.[6]  This left counts pertaining to three homicides and four sexual assaults joined in the capital proceeding.  Both trials were conducted in front of Judge Gerst.  After the juries returned verdicts, the matters were re-consolidated for sentencing.

## III.  TRIAL ISSUES

### A. *PRECLUSION OF EVIDENCE*

#### 1. Right to Confront Adverse Witnesses

¶16      Defendant claims that limits placed upon cross-examination at trial violated his fundamental right to confront adverse witnesses under the Sixth and Fourteenth Amendments to the United States Constitution.[7]  *See Pointer v. Texas*, 380 U.S. 400,

---

[6] With respect to the sexual assault counts that were severed, each of the victims -- J.T., S.G., and T.H. -- had been hypnotized at some point in the investigation of the crimes.  Presumably, the trial court sought to insulate the capital cases from the taint of any post-hypnosis testimony.  However, the judge did allow two of these sexual assault victims to testify in the capital trial.

[7] The defendant also asserted his confrontation right under article II, section 24 of the Arizona Constitution, and Arizona Revised Statutes section 13-114(3), but did not brief or argue this claim.  Because federal law is sufficient to decide the

403, 85 S.Ct. 1065, 1068 (1965); *State ex rel. Collins v. Superior Ct.*, 132 Ariz. 180, 187, 644 P.2d 1266, 1273 (1982). We agree. Moreover, because we cannot say beyond a reasonable doubt that this error had no effect on seven of the thirty-seven verdicts in this case, including two of the first-degree murder convictions, we must reverse them.

a) The *Frye* Hearing

¶**17**    Arizona adheres to the *Frye* standard in ruling on the admissibility of novel scientific evidence. *State v. Bible*, 175 Ariz. 549, 580, 858 P.2d 1152, 1183 (1993) (citing *United States v. Frye*, 293 F. 1013 (D.C. Cir. 1923)). Three conditions must be satisfied for the receipt of such evidence. The proponent must first demonstrate that the principles being applied are "generally accepted in the relevant scientific community." *Bible*, 175 Ariz. at 578, 858 P.2d at 1181. The court must also decide the general acceptance of the technique(s) being used in the application of such principles. *State v. Tankersley*, 191 Ariz. 359, 364-65, 956 P.2d 468, 491-92, ¶ 14 (1998). Finally, there needs to be a foundational showing that correct procedures were followed in a given case. This foundation is distinct from the *Frye* finding itself and, in the judge's discretion, may initially be provided at

_____

matter, we do not discuss or rely upon these state provisions.

trial in front of the jury rather than at a separate hearing. *Bible*, 175 Ariz. at 580-81, 858 P.2d at 1183-84.

¶18    Prior to the start of testimony, the defendant's case was consolidated with seven others for the limited purpose of a *Frye* hearing.  This proceeding took place in front of Judge Ronald Reinstein.  Its objective was to determine the admissibility of DNA evidence processed at the DPS laboratory.

¶19    At the hearing, Judge Reinstein took notice of the fact "that the principles and theory underlying DNA analysis in forensic labs are generally accepted in the scientific community, and that DNA RFLP [restriction fragment length polymorphism] procedures in particular meet the *Frye* test of general acceptance as well."  He then declared that his principal task was to determine "whether the DPS DNA lab's RFLP protocol meets the general acceptance test."  A substantial portion of the *Frye* hearing was devoted to this inquiry.[8]

¶20    A protocol describes the manner in which a particular type test is to be performed.  DPS originally based its protocol for RFLP testing on that of the FBI.  During the *Frye* hearing, the defense attacked the DPS protocol, focusing on modifications the

---

[8] The *Frye* hearing also addressed several methods for calculating the statistical probability of a random match, which are not at issue in this case.

lab had made to FBI procedures. Specifically, the defense questioned variations in the use of ethidium bromide and differences in the length of gels.

¶21        The defense also criticized the DPS validation studies. Such studies are designed by a lab to verify that it can reliably perform the testing procedures established in the protocol. As such, they can be essential to quality control. David H. Kaye & George F. Sensabaugh, Jr., *Reference Guide on DNA Evidence*, *in Reference Manual on Scientific Evidence* 485, 510 (Fed. Judicial Ctr. ed. 2000). The defense attack focused on a lack of documentation, numerous technical errors, and the apparent manipulation of autorads in the DPS validation studies.[9]

¶22        Ultimately, Judge Reinstein concluded that DNA evidence from the lab was admissible because the DPS RFLP protocol was generally accepted in the relevant scientific community. As for the validation studies, the judge was not persuaded that the alleged errors called the DPS protocol into question. Instead, he found "that the validation studies are really in the guise of training exercises and experiments." In the judge's view, "actual casework validates the laboratory protocol daily. The 'proof is in the pudding' . . . ."

---

[9] For example, in one validation study bands had been "penciled in" on the autorads prior to computer analysis.

13

### b) Precluded Cross-Examination at Trial

¶23    The defendant sought to cross-examine the state's DNA experts about the DPS protocol.  The prosecution moved to preclude this evidence, arguing that permitting such cross-examination would allow the defense to relitigate issues that had already been decided by Judge Reinstein.  Judge Gerst agreed, finding that issues relating to the reliability of the DPS protocol were "not reviewable by this jury as issues to be decided in this case."  The judge looked to Arizona Rule of Evidence 403 and found that the danger of juror confusion substantially outweighed the probative value of cross-examination.  The crux of his ruling was that the laboratory's underlying methodology was not within the jury's province.  He limited cross-examination to "attacks on lab analysis error, individual case matching, lab slop, and things of that nature."[10]

### c) Admissibility and Weight

¶24    It is a basic maxim that judges determine admissibility of evidence and juries decide what weight to give it.  As Wigmore puts it, "[w]hen evidential data are once admitted by the judge and there is a sufficiency of them to entitle the case to go to the

---

[10] Judge Gerst admitted, "that's [a] subject which obviously I could be wrong on and we can have reasonable disagreement on, and the appellate court can tell me if I am."

jury, their individual and total weight or probative value is for the decision of the jury." 9 John Henry Wigmore, *Wigmore on Evidence* § 2551, at 664 (Chadbourn rev. 1981). Likewise, it is standard practice not "to give jurors a chance to consider issues already decided by the judge, sometimes referred to as a 'second bite at the apple.'" Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 104.60(2) (Joseph M. McLaughlin ed., 2d ed. 2001).

¶25    The state's position assumes that because the evidence was originally presented at the *Frye* hearing, repeating it at trial would challenge Judge Reinstein's ruling regarding general acceptance of the protocol, thus providing a "second bite at the apple." This argument fails to recognize that very often the same proof used to establish admissibility also impacts weight and credibility.

¶26    A *Frye* determination is a preliminary finding regarding the admissibility of scientific evidence and expert qualifications. It is the judge who is called upon to make this determination. Ariz. R. Evid. 104(a). Yet, according to Rule 104(e), the judge's role in determining preliminary questions "does not limit the right of a party to introduce before the jury evidence relevant to weight or credibility." Ariz. R. Evid. 104(e). Implicit in this rule is an awareness that some evidence presented at the preliminary

hearing will also be relevant to credibility and weight. Otherwise, Rule 104(e) would be superfluous.

¶27     Other jurisdictions have recognized this principle.  In *United States v. Velasquez*, the Third Circuit reversed the trial court for not allowing a critic of handwriting analysis to testify before the jury after the judge had deemed such analysis admissible.  64 F.3d 844 (3rd Cir. 1995).  The panel accused the district court of "ignor[ing] the fact that the same considerations that inform the court's legal decision to admit evidence under Rule 702 may also influence the factfinder's determination as to what weight such evidence, once admitted, should receive."  *Id.* at 848.

¶28     The North Carolina Supreme Court has reached a similar conclusion, stating that

> [o]nce disputed evidence is admitted at the trial, its weight and credibility are for the jury.  Therefore, if otherwise competent, to the extent that it bears upon such weight or credibility, the same testimony which failed to convince the judge to grant the motion to suppress is admissible before the jury.

*State v. Sanchez*, 400 S.E.2d 421, 424 (N.C. 1991) (quoting 1 *Brandis on North Carolina Evidence* § 19a (3d ed. 1988)).

¶29     We agree that the jury must be allowed to hear such evidence if it is to properly perform its function as factfinder. *See, e.g., Logerquist v. McVey*, 196 Ariz. 470, 476, 487-88, 1 P.3d 113, 119, 130-31, ¶¶ 20, 51-55 (2000).  As the North Carolina

16

Supreme Court has noted, "[a]dmissibility is for determination by the judge unassisted by the jury. Credibility and weight are for determination by the jury unassisted by the judge." *Sanchez,* 400 S.E.2d at 424. The trial court's blanket preclusion of evidence from the *Frye* hearing in this case infringed upon the role of the jury and improperly insulated the state's evidence from critique.[11]

¶30    Judges, in their discretion, may place reasonable limits upon the scope of cross-examination, without infringing upon the defendant's right of confrontation. *State v. Fleming*, 117 Ariz. 122, 125, 571 P.2d 268, 271 (1977). "The test is whether the defendant has been denied the opportunity of presenting to the trier of fact information which bears either on the issues in the case or on the credibility of the witness[es]." *Id.* Cross-examination concerning the DPS protocol would have provided information with which the jury could weigh testimony concerning the DNA results. Because the restrictions in this case crossed the

---

[11] For an example that is somewhat analogous, see Joseph M. Livermore, et al., *Arizona Practice: Law of Evidence* § 104.7 (4th ed. 2000):

> [E]ven if the court admits an out-of-court statement under rule 804(b)(2) (the "dying declarations" exception) . . . the objecting party may introduce evidence before the jury that tends to show that the declarant did *not* believe her death was imminent when she made the statement, since such evidence would be relevant to the weight that the jury should give the statement.

line from reasonable to excessive, they breached the defendant's right to confront adverse witnesses.

### 2. Right to Present Testimony

¶31    The defendant also argues that his Sixth Amendment rights were violated because the judge's ruling precluded him from presenting expert testimony regarding the protocol, validation studies, and match window.  We agree.  As noted above, the judge's application of Rule 403 was based on the erroneous assumption that evidence from the *Frye* hearing would play no significant role in the jury's consideration.  Thus, the trial court abused its discretion when it found that the probative value of this evidence was outweighed by the risk of juror confusion.[12]

### 3.  Reversible Error

¶32    Though we have determined that the trial judge erred in precluding the defendant's cross-examination and expert testimony in violation of the Sixth Amendment, we still must decide whether this error was reversible.  "A constitutional error is harmless if

---

[12] The state asserts an alternative basis for the trial court's decision to preclude the defense expert's testimony. According to this theory, the trial judge found that the defense expert, Dr. Aimee Bakken, was not qualified as an expert in forensic science under Arizona Rule of Evidence 702.  We do not believe that the record, read in context, supports this assertion.  Whatever the judge's observations about Dr. Bakken's qualifications, they appear to be mere surplusage and not the basis of his holding.

it can be said beyond a reasonable doubt that the error had no influence on the verdict of the jury." *State v. Luzanilla*, 179 Ariz. 391, 398, 880 P.2d 611, 618 (1994).

¶33 DNA analysis was a significant part of the evidence against the defendant in six of the ten cases, including two of the three homicides. In fact, DNA was the only physical evidence linking the defendant to those two murders. As the prosecutor said in closing argument, "It's when you get to the DNA you know he's guilty of the murders."

¶34 The state argues that any error was harmless because the defendant was not totally precluded from criticizing the DNA evidence before the jury. However, the mere fact that the defense was allowed to question the reliability of the DNA evidence on a limited basis does not cure the error in this case. We have previously noted that "'science' is often accepted in our society as synonymous with truth." *Bible*, 175 Ariz. at 578, 858 P.2d at 1181 (quoting Morris K. Udall, et al., *Arizona Practice: Law of Evidence* § 102, at 212 (3d ed. 1991)). This is particularly so in the case of DNA evidence, which has the potential to dominate a factfinder's thinking. Accordingly, in deciding whether the error here was harmless, we must determine whether there was other substantial evidence supporting the convictions.

¶35 For all but three of the victims, there was credible eye-

19

witness identification, physical evidence apart from DNA, or other corroborating facts clearly implicating the defendant.  The error in precluding evidence from the *Frye* hearing was harmless as to them and we need not disturb the verdicts.  The counts related to the attacks upon M.M., M.C. and W.C., however, are another matter.

a) M.M.

¶36     M.M.'s body was discovered in the desert near the Carefree Highway and I-17 on February 19, 1992.  There were signs of sexual assault, and her skull was fractured in several places.  There was, however, no physical evidence linking the defendant to this attack.  A single sperm was found on the victim's body.  David Duplissa, a DPS lab technician, conducted a five-probe RFLP analysis on this sample and testified that the results were "inconclusive."

¶37     But Duplissa also said that on one of the five probes "there is an indication or a hint of an area of intensity in the same location as a band, the top band of Scott Lehr's . . . and [an] even fainter hint of the bottom band."  He further testified that on another probe, "[t]he male fraction of the anal swab shows a very faint band lining up in the same visual location as the top band of Scott Lehr and then an even fainter shadow below for the bottom."  As a result, according to Duplissa, "the entire profile or the entire pattern [is] inconclusive.  But [one] cannot exclude

20

the defendant as being a possible donor."

¶38     The defendant argues that these inconclusive results should not have been admitted because their probative value was substantially outweighed by their prejudicial effect.  Although Duplissa's testimony may have invited the jury to speculate that there really was a match, we need not address this question.  The fact that there was considerable discussion of DNA evidence, and little else, brings the preclusion error into play.[13]  The jury's evaluation of this highly equivocal testimony might well have been different had the defense been permitted cross-examination and additional evidence regarding the methods and conduct of the DPS lab.

¶39     The state argues, however, that similarities between the sexual assault and murder of M.M., and the attacks upon the other victims, were alone sufficient to support the verdict.  Although the state points to some ten similarities it detects among the attacks, the modus operandi it advances can be summarized as follows: the perpetrator lured small women into his car from the street, drove them to the northern desert, sexually assaulted them, often struck them with rocks (sometimes causing death), and then

---

[13] The state even argues on appeal that the inconclusive test of the DNA sample taken from M.M. is significant because a single band match failed to exclude defendant as a donor.

21

left them in the desert. While these likenesses may be probative of identity, we cannot say they are striking enough to overcome the prejudice of precluding the cross-examination and expert testimony in this case. Thus, we cannot say that the error was harmless.[14]

b) W.C.

¶40 After testifying at trial about her attack, W.C. was asked by the prosecutor if her assailant was in the courtroom. She said, "It looks like him, that gentleman back there." The man she referred to was not the defendant. The prosecutor then took W.C. off the stand and placed her in front of the defendant. He asked her if she had come into contact with the defendant on the night she was attacked. She said, "No." He asked if she remembered ever seeing the defendant before. Again, she indicated not. When further asked whether she had ever had sex with the defendant, she said, "No."

¶41 In closing argument, the state downplayed the significance of W.C.'s in-court identification, or lack thereof, by emphasizing that DNA from semen found in her vagina matched the defendant's. As the state reminded the jury, a DPS witness testified that the probability of a random match to the defendant

---

[14] In fact, the error seems particularly significant given that M.M. was last seen getting into a large black truck with a man who did not fit the defendant's description.

was one in eleven million.  Thus, it is likely that the DNA evidence carried the day for the prosecution.  Given the credibility problems engendered by W.C.'s failure to identify the defendant in court, we cannot say that there is enough non-DNA evidence to support the verdict.

c) M.C.

**¶42** M.C.'s body was found in an orchard near 59th Avenue and Utopia on the morning of November 8, 1991.  She had been sexually assaulted and her skull was fractured on both sides.  According to analysis by the DPS lab, DNA from semen taken from her vagina and rectum matched the defendant's at all five probes.  Testimony again indicated that there was a one in eleven million chance of a random match to the defendant's DNA.  There was no other physical evidence implicating him.

**¶43** Thus, DNA evidence was critical to the charges regarding M.M., W.C., and M.C.  We cannot say beyond a reasonable doubt that the error in precluding the defendant from challenging that evidence with material from the *Frye* hearing had no influence upon the verdicts.  Accordingly, the error was not harmless and these verdicts must be reversed.

## B. *ALLEGEDLY TAINTED IDENTIFICATIONS*

### 1. Background

¶44     On February 23, 1992, E.R. was walking along the street when she was picked up by a man, taken to the desert, sexually assaulted, and beaten.[15]  While recovering in the hospital, E.R. described her attacker to police.  On June 23, 1992, a police detective went to E.R.'s home and showed her three photographic spreads, two of which contained pictures of Scott Lehr.  The victim was unable to positively identify the defendant as her attacker.  Lehr was arrested on June 25, 1992, two days after the photo spread.  Once he was in custody, police arranged a live lineup of six men.  E.R. identified Lehr as her attacker at the lineup.  During her trial testimony, she indicated that the defendant was her assailant.

### 2. Due Process

¶45     Defendant advances two due process arguments: first, that the lineup was tainted by the prior viewing of the photo spread; and second, that the in-court identification was tainted by the lineup.

        a) The Lineup

¶46     We review the fairness and reliability of a challenged

---

[15]   *See supra* ¶ 13.

identification for clear abuse of discretion. *State v. Atwood*, 171 Ariz. 576, 603, 832 P.2d 593, 620 (1992). The Due Process Clause of the Fourteenth Amendment requires us to ensure that any pretrial identification procedures are conducted in a manner that is fundamentally fair and secures the suspect's right to a fair trial. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253 (1977). "It is the likelihood of misidentification which violates a defendant's right to due process . . . ." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381-82 (1972). The mere fact that a pretrial identification procedure is overly suggestive, however, does not bar the admission of an identification. *Brathwaite*, 432 U.S. at 112, 97 S.Ct. at 2252. Instead, the question is whether the identification is reliable in spite of any suggestiveness. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Id.* at 114, 97 S.Ct. at 2253. Thus, there is a two-part test for determining admissibility: (1) whether the method or procedure used was unduly suggestive, and (2) even if unduly suggestive, whether it led to a substantial likelihood of misidentification, i.e., whether it was reliable. *See Styers v. Smith*, 659 F.2d 293, 297 (2d Cir. 1981); *Green v. Loggins*, 614 F.2d 219, 223 (9th Cir. 1980). If the lineup

25

procedure[16] was unduly suggestive, *and* the lineup identification was not reliable enough to avoid a substantial likelihood of misidentification, then the testimony must be excluded.

¶47       Making a defendant the only common person in both a photo spread and a live lineup can be unduly suggestive. *State v. Via*, 146 Ariz. 108, 119, 704 P.2d 238, 249 (1985).  Here, the witness saw a photo spread and did not identify anyone.  She later saw a lineup and identified the defendant.  Lehr was the only person common to both the photos and the lineup.  This arrangement was arguably unduly suggestive.

¶48       "If the court finds that the pretrial identification procedure was unduly suggestive, it must next address the question whether the identification is nevertheless reliable."  *State v. Smith*, 146 Ariz. 491, 497, 707 P.2d 289, 295 (1985) (citing *Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253).  In *Via*, we stated that due process is not violated so long as there is "no substantial likelihood that [the defendant] would be misidentified."  146 Ariz. at 120, 704 P.2d at 250. We use the so-called *Biggers* test to determine reliability.

---

[16] Despite the fact that two of the three photo arrays included pictures of the defendant, he limits his challenge to the live lineup and the in-court identification.

> [T]he factors to be considered [in evaluating the likelihood of misidentification] include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253 (citing *Biggers*, 409 U.S. at 199-200, 93 S.Ct. at 382).

¶49        Here, the victim testified that she was able to observe her assailant from a few feet away while he drove her out of town, a ride she estimated to be up to two hours long. Moreover, as the car passed under street lights, she "had quite a few good glances" at the driver, including once at the last stoplight on the way out of town, where she "got a really full look at him and he was looking at me." In addition to having ample opportunity to view her attacker, *see State v. Smith,* 146 Ariz. 491, 497-98, 707 P.2d 289, 294-95 (1985) (suspect viewed walking across parking lot at night), E.R. was attentive out of fear for her own safety. *See id.* (fear sufficient to satisfy degree of attention)*; State v. Alvarez*, 145 Ariz. 370, 371-72, 701 P.2d 1178, 1179-80 (1985) (same).

¶50        Prior to seeing the photo spread, E.R. gave an accurate and detailed description of her assailant. She indicated that he was a "white male, in his late 20s to early 30s. Approximately six foot one. 170 to 180 pounds. . . . [h]e was muscular in the chest

27

area. . . . Short and then preens to the top, hair is brown, combed back. Light moustache. Four to five days' growth of beard, large ears." At the live lineup, Lehr was six feet two, weighed one hundred seventy five pounds, had brown hair, and was a few days younger than thirty-five years old. The victim further testified that she recognized the defendant the moment she entered the lineup viewing room, and was absolutely certain. *See Alvarez*, 145 Ariz. at 372, 701 P.2d at 1180 (identification occurred "immediately and without hesitation."). These factors indicate that the identification was reliable.

¶51      The only thing that gives us pause is the passage of four months between the crime and the identification. In light of the strength of the other *Biggers* factors, however, the time lapse in this case does not threaten reliability. *See Biggers*, 409 U.S. at 201, 93 S.Ct. at 383 (seven month delay did not outweigh other reliability factors); *State v. Schilleman*, 125 Ariz. 294, 297, 609 P.2d 564, 567 (1980)(five month delay not fatal). The lineup did not violate the defendant's due process guarantees.

b)  In-Court Identification

¶52      An in-court identification may be tainted by suggestive lineup procedures. *Smith*, 146 Ariz. at 496, 707 P.2d at 294. However, if the pretrial identification comports with due process, subsequent identification at trial does not violate a defendant's

28

rights merely by following on the heels of the earlier confrontation. *See Via*, 146 Ariz. at 120, 704 P.2d at 250; *State v. Newman*, 141 Ariz. 554, 557, 688 P.2d 180, 183 (1984); *State v. Trujillo*, 120 Ariz. 527, 529, 587 P.2d 246, 248 (1978). Because E.R.'s out-of-court identification was reliable, her in-court identification was admissible.

## C. *BURDEN SHIFTING*

### 1. Background

¶53 The police recovered a paper cup from C.Z.'s crime scene. The state's fingerprint expert, Karen Jones, testified on direct examination that she had originally compared the defendant's prints with those found on the cup in April 1991. At that time, she had been unable to make an identification. Three years later, fingerprint identification technology had advanced to the point where a more exacting examination of the cup was possible. Jones then used this new technology to compare the prints from the cup with the defendant's prints and found a match.

¶54 On cross-examination, the defense questioned Jones about her change of opinion. Counsel asked whether anyone involved in the investigation had informed her that comparison of material found on C.Z.'s body with Lehr's DNA had yielded inconclusive results. Jones replied that she had not heard the DNA results were inconclusive prior to reexamining the print on the cup.

¶55     On redirect, the prosecutor asked Jones whether the fingerprint cards containing prints which had been recovered from the crime scene were still on file. She answered that she believed they were. The prosecutor then asked, "[A]re there other experts outside the Phoenix Police Department that could look at these prints and verify or not verify those?" Defendant moved for a mistrial, and the motion was denied.

## 2. Prosecutorial Misconduct

¶56     Defendant argues that the trial court abused its discretion by denying his motion for a mistrial based on a claim of prosecutorial misconduct. We review the trial court's decision for a clear abuse of discretion. *State v. Lee*, 189 Ariz. 608, 616, 944 P.2d 1222, 1230 (1997). The defense asserts that the prosecutor's question was tantamount to a comment upon the defendant's failure to produce evidence of a non-match. It claims that this transformed the state's burden to prove guilt into the defendant's burden to prove innocence.

¶57     We rejected a similar argument in *State ex rel. McDougall v. Corcoran*, 153 Ariz. 157, 160, 735 P.2d 767, 770 (1987). There, we held that discussing a defendant's failure to produce evidence is permissible so long as it does not constitute a comment on his or her silence. *Id.* We concluded that "[t]he inference that may

30

be drawn from [the defendant's] failure to produce evidence -- that the facts were unfavorable to him -- is not unreasonable." *Id.* We find no error.

## IV. SENTENCING ISSUES

### A. *CONSTITUTIONAL CHALLENGE*

¶58      The defense argues that Arizona's judge-sentencing death penalty scheme is unconstitutional in light of the United States Supreme Court decision in *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215 (1999).  We rejected this argument in *State v. Ring*, 200 Ariz. 267, 25 P.3d 1139, ¶ 44 (2001), and need not revisit it here.

### B. *INDEPENDENT REVIEW AND REWEIGHING*

¶59      Defendant has not raised any other issues regarding the imposition of the death penalty in this case.  Nonetheless, we must independently review the aggravating and mitigating circumstances found by the sentencing court to determine the propriety of the death sentence for the murder of B.C., the only remaining capital offense.  Ariz. Rev. Stat. § 13-703.01(A); *State v. Nordstrom*, 200 Ariz. 229, 25 P.3d 717 (2001).

#### 1. Aggravating Circumstances

¶60      The sentencing court found beyond a reasonable doubt that the state had proven the aggravating circumstance set forth in Arizona Revised Statute section 13-703(F)(1).  That section applies

31

to a "defendant [who] has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable." The judge based this finding on the two other first degree murder convictions in this case. We have now reversed those convictions. However, there is ample other evidence supporting this finding. Defendant was convicted of numerous counts of kidnapping and sexual assault, for which life sentences were imposed.

¶61     The judge also found that the state had proven beyond a reasonable doubt the aggravating circumstance set forth in Arizona Revised Statute section 13-703(F)(2). Under this section, as it existed at the time of the murder, previous conviction of a "felony in the United States involving the use or threat of violence on another person" constitutes an aggravator. In this case, the defendant was convicted of three counts of attempted first degree murder, and two counts of aggravated assault. These convictions fulfill the requirements of section 13-703(F)(2). *See State v. Lee*, 189 Ariz. 590, 604, 944 P.2d 1204, 1218 (1997) ("A sentencing court may consider any convictions entered previously without regard to the order of the underlying crimes.").

¶62     The sentencing court also found that the murder of B.C. was committed in an especially cruel manner, under section 13-703(F)(6). Based upon inferences from the experience of victims

who survived the defendant's attacks, the judge concluded that the victim "suffered incredible terror and mental anguish from the moment [she] realized [she] was abducted, through painful and degrading sexual acts being forced upon [her], to the very moment [she] was murdered." (Special Verdict at 10). The court further concluded that the murder of B.C. was especially heinous or depraved, under section 13-703(F)(6). It decided beyond a reasonable doubt that the crime was senseless, the victim was helpless, and that witness elimination was a motive for the murder.

¶63 While we understand the sentencing judge's inclination to find that this crime fit the pattern of the others, we cannot agree that the F(6) aggravator has been established beyond a reasonable doubt. Very little is known about the circumstances of the victim's death. Her remains were out in the desert for several months. Thus, her body was incomplete and severely decomposed by the time it was discovered. Her hands, feet, and other bones were missing. There was no testimony regarding defensive wounds or anything else that would establish that she was conscious at the time of her death. Moreover, given all that we do not know regarding how she found herself in the desert, it is simply too speculative to conclude that this homicide was committed in a cruel, heinous, or depraved manner. Nonetheless, the F(1) and F(2) aggravators we have found are adequate to warrant the death

33

penalty, absent sufficient mitigation.

### 2. Mitigating Circumstances

¶64 The sentencing judge determined that the defendant failed to show by a preponderance of the evidence any of the statutory mitigating factors listed in section 13-703(G)(1)-(5). As for non-statutory factors, the court decided that the following were not mitigating: expert opinion regarding the appropriateness of the death penalty in this case; harm to the defendant's family; a single request for the death penalty from only one victim's family; and lack of good childhood male role models. It also found that lingering doubt as to the actual commission of the murder had not been proven by a preponderance of the evidence.

¶65 The court determined that the following non-statutory mitigating factors had been proven by a preponderance of the evidence: the defendant was a good father to his children, a good husband to his wife, and a good son to his mother; he had no prior record of criminal behavior or accusations of violence of any kind; and he had been a model prisoner while in custody. We accept and approve the trial judge's findings regarding mitigation.

### 3. Conclusion

¶66 We also agree with the sentencing court that the mitigating factors here are weak. We do not find that they are

34

sufficient to warrant leniency. Accordingly, we conclude that the imposition of the death penalty for the murder of B.C. was appropriate in this case.

## V. DISPOSITION

¶67    Finding error as described in this opinion, we reverse the defendant's convictions and sentences on counts one, two, three, eight, nine, eighteen, and nineteen from the capital trial and remand to the trial court for proceedings not inconsistent with this opinion. We affirm the defendant's remaining convictions and sentences from the capital trial and all of the convictions and sentences from the non-capital trial.


_____
THOMAS A. ZLAKET, Justice

CONCURRING:


_____
CHARLES E. JONES, Chief Justice


_____
RUTH V. MCGREGOR, Vice Chief Justice


_____
STANLEY G. FELDMAN, Justice


_____
FREDERICK J. MARTONE, Justice

35