NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

FRANKLIN ARNETT CLIFTON, *Appellant*.

No. 1 CA-CR 16-0834
FILED 1-11-2018

---

Appeal from the Superior Court in Maricopa County
No. CR 2013-108924-001
The Honorable M. Scott McCoy, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Maricopa County Legal Defender's Office, Phoenix
By Cynthia D. Beck
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Jennifer B. Campbell delivered the decision of the Court, in which Presiding Judge Michael J. Brown and Judge James B. Morse Jr. joined.

---

**C A M P B E L L**, Judge:

¶1 Franklin Arnett Clifton appeals his convictions and sentences for a single count of drive-by shooting and two counts of aggravated assault. Clifton argues (1) the superior court abused its discretion in admitting opinion testimony from a detective because it went to the ultimate issue, usurping the role of the jury, and (2) the court erred by ruling that the pretrial identification of the defendant was not conducted in an unduly suggestive manner. Because no reversible error occurred, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2 In February 2013, four friends—D.A. ("Driver"), L.G. ("Passenger"), and two others—were at a hookah lounge together when it closed at 2:00 a.m. They all left in the same car. While waiting to turn left at an intersection, a truck pulled up behind them and began revving its engine and honking its horn. When the light turned green, Driver made the left turn, immediately moving into the middle lane to allow the truck to pass. The truck, however, did not pass, but continued to tail them. After hearing what "sounded like a rock" hitting the car, they realized the noise was gunfire. The truck then pulled in front of their car and stopped, forcing Driver to stop as well. The driver of the truck fired at their car again, and Passenger saw the truck's driver lean out of his window. She described him as a "[h]eavyset, African-American male" holding what she thought was a "Glock." Passenger also described the truck as a "black, lifted truck with white stickers on the back window and Utah plates." Driver described the truck as "tall, black lifted, chrome," with decals on its windows and an orange or red license plate. The truck then made a U-turn and drove away. Driver "booked it" away from the scene and Passenger called 9-1-1.

¶3 Two police officers were patrolling nearby when they heard the gunshots. Passenger had provided a description of the pickup truck to the radio dispatch operator. A sergeant communicated over the radio that he had seen a matching vehicle parked on a nearby street. Officers went to

that location and saw the truck backed into a driveway. They approached the house, and Clifton came outside. The officers spoke with Clifton, and he identified the black Dodge Ram with a Utah license plate parked in the driveway as his. Clifton at one point said he had been at a bar and only arrived home about one minute before the officers had arrived, but told another officer he had been home for 45 minutes. One of the officers also felt the hood of the truck and found that it was warm to the touch.

¶4        Days later, officers approached the same house in order to arrest Clifton. After setting up surveillance around the residence, they watched Clifton walk outside with a pack of cigarettes. Clifton stood behind the tailgate area of the parked black Dodge Ram and smoked a cigarette. The officers converged and arrested Clifton, also seizing a Ruger .44 Magnum revolver found on top of the open tailgate beside his cigarette pack.

¶5        Passenger identified Clifton in a photographic lineup prior to trial, and testified about that identification at trial. Also at trial, the jury heard testimony from a forensic firearm examiner who determined, after testing, that the bullet fired into Driver's car came from the Ruger .44 Magnum revolver in Clifton's immediate vicinity at the time of his arrest. A police officer testified that, after searching the truck at the time of arrest, they found a speed-loader for the revolver and a Ruger handgun box imprinted with Clifton's name and the gun's serial number. A detective also testified that Clifton's truck was a "[l]ifted, black in color, Dodge 1500 pickup truck" with "stickers in the rear window" and a "red and orange type" Utah license plate.

¶6        The State charged Clifton with one count of drive-by shooting, a class 2 dangerous felony, and two counts of aggravated assault, class 3 dangerous felonies. Clifton's first trial ended in a mistrial; prior to retrial, Clifton moved for a *Dessureault* hearing challenging Passenger's pretrial identification. *See State v. Dessureault*, 104 Ariz. 380, 384 (1969). Following an evidentiary hearing, the court denied Clifton's request to preclude the identification. After the retrial, the jury found Clifton guilty of all three counts. The court sentenced Clifton to an aggravated term of 13 years in the Department of Corrections on the drive-by shooting count, to run concurrently with consecutive presumptive terms of 7.5 years on both counts of aggravated assault.

**DISCUSSION**

I.    **Opinion Testimony**

¶7          During trial, the following exchange took place between the State and the case's lead detective—Detective Darby—during redirect examination:

Q: You were repeatedly asked questions about an alleged shooting. Do you recall those just before lunch?

A: I do.

Q: In fact, regarding "alleged," did you discover and investigate a shooting that actually happened the morning of February 8th, 2013?

A: Yes, a shooting did occur.

Q: Nothing alleged about it; correct?

A: Nothing alleged about it.

Q: In fact, two of your co-workers independently heard the sound of gunfire; correct?

A: They did.

Q: And even taking the 911 call out of it, your system reported residents calling in with the sounds of gunfire?

A: Yes, ma'am.

Q: Now, through the course of the investigation, the police were able to determine that it was the defendant's black pickup truck that was involved in the shooting; correct?

A: Yes.

Q: And that the defendant was the driver of the black pickup truck at the time of the shooting?

A: Correct.

Q: And that it was the defendant's revolver, the .44 Magnum, that was the gun used to shoot at [Driver] and [Passenger] inside the car; correct?

A: Yes.

Q: And that the defendant was the shooter; correct?

A: Yes.

. . .

 [Defense counsel]: Objection.

. . .

[Defense counsel]: It's -- at this point she's basically presenting his opinion about the charges in this case and how he can comment on the evidence and which charges would fit the evidence, and so I object. This, the whole line of questioning, not just this part.

[State]: Judge, I didn't mention charges. . . . I told the Court if the defense went there, because they kept -- in spite of the record I made this morning, the detailed record, the record I made last week, we're still having inappropriate allegations of alleged shooting and alleged complaining witnesses. . . . I didn't say charging. It's appropriate. It's redirect. They opened the door.

[The court]: I'm going to overrule the objection.

. . .

[Defense counsel]: And I guess I want to, with all due respect, make the record complete.

. . .

It's up to the jury to decide whether or not the State's met their burden in this case beyond a reasonable doubt. For the State to basically spoon-feed the jurors this is no longer alleged, it is what it is, is having the detective make an inappropriate comment on the evidence in this case and the nature of the

5

evidence that they've presented in this case. And so that's why I'm objecting.

**¶8** Clifton argues the trial court abused its discretion by allowing the State's witness to testify that the drive-by shooting and Clifton's involvement were facts rather than allegations. He contends this was improper lay witness opinion testimony that instructed the jury on how to decide the case. We review a trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *State v. Dann*, 220 Ariz. 351, 365, ¶ 66 (2009).

**¶9** "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ariz. R. Evid. 701; *see also State v. Peltz*, 242 Ariz. 23, 29, ¶ 17 (App. 2017) ("[W]hen a lay witness is drawing a reasonable inference from [the witness's] own firsthand knowledge and perceptions of a situation, the witness is competent to voice [the witness's] opinion . . . even as to the ultimate issue.") (citations omitted). While witnesses "are not permitted as experts on how juries should decide cases," Ariz. R. Evid. 704 cmt. (1977), an opinion is not objectionable "just because it embraces an ultimate issue," Ariz. R. Evid. 704(a). Generally, however, a witness may not indicate his belief in a defendant's guilt. *State v. Williams*, 133 Ariz. 220, 228 (1982) (citation omitted).

**¶10** Clifton acknowledges that Darby's statements "may have been based, in part, on his perceptions as an investigator," but argues that "[t]elling the jury that the elements of the charged offenses were conclusively proven did nothing to help the jury understand his testimony." Regardless of whether this was improper lay witness testimony, however, any abuse of discretion on the part of the superior court in allowing this testimony was harmless error. *See State v. Sosnowicz*, 229 Ariz. 90, 98, ¶ 27 (App. 2012) (even when testimony is erroneously admitted, we will affirm the verdict if the error was harmless) (citation omitted). Error is harmless if the State, "in light of all of the evidence, can establish beyond a reasonable doubt that the error did not contribute to or affect the verdict." *State v. Valverde*, 220 Ariz. 582, 585, ¶ 11 (2009) (citations omitted).

**¶11** Applying this standard here, even assuming that the detective's testimony was improper, any error was harmless. The offending

portion of Detective Darby's testimony was a relatively brief exchange in the course of an 11-day trial. The jury was instructed about its role as the sole judge of the facts, the presumption of innocence, and that the charges are not evidence. We presume that jurors follow the court's instructions. *See State v. Newell*, 212 Ariz. 389, 403, ¶ 68 (2006). Furthermore, the jury heard testimony from multiple victims identifying the truck parked in the driveway as the vehicle involved in the shooting. Multiple police officers testified about hearing gunshots and finding that truck shortly thereafter. Clifton identified himself as the owner of that truck. An officer also testified that the hood of the truck was still warm when they arrived at the scene, indicating that it had recently been operated. One of the victims testified that she identified Clifton in a pretrial photographic lineup. The jury also heard forensic testimony that a specific handgun in Clifton's immediate vicinity at the time of his arrest was the gun that fired the bullet found in Driver's car.

**¶12**     In the face of such overwhelming evidence against the defendant, the jury would have found Clifton guilty even without the admission of Detective Darby's testimony. *See, e.g., State v. Poyson*, 198 Ariz. 70, 77-78, ¶ 22 (2000). We conclude that the jury verdicts were "surely unattributable" to any possible discretionary error and therefore Detective Darby's testimony constituted harmless error. *See Valverde*, 220 Ariz. at 585, ¶ 11.

## II.     Pretrial Identification

**¶13**     Eleven days after the incident, Sergeant Daukas met with Passenger to see if she could identify a suspect from a photographic lineup. Daukas prepared a grayscale six-photograph lineup that included Clifton and five other individuals. Daukas selected the other five photos through the police department's "crime capture system," choosing photos to "best match the person of interest" based on the same physical characteristics, including "anything from facial structure to overall body build, size, shape, anything that could be used to make as similar pictures as possible." The computer randomly selected Clifton's photo to appear in the second position in the lineup.

**¶14**     Daukas gave Passenger a written admonition, which cautioned that this "group of photographs may or may not contain a picture of the person who committed a crime now being investigated." The admonition also instructed, "[w]hen you have looked at all the photos, tell me whether or not you see the person who committed the crime." Daukas directed Passenger to "read through this, and when you're done reading

this, go ahead and tell me if you have any questions." Passenger read the admonition to herself and signed it.

¶15        Daukas told Passenger to first get a mental picture of the man who had leaned out of the truck's window. He placed the lineup in front of her upside-down, telling her to turn the lineup over when she was ready and point out the man if she saw him. Passenger initially remarked that they "all look the same," but then quickly eliminated photos 1, 4, 5, and 6. Indicating that she was deciding between photos 2 and 3, Daukas asked Passenger what about the two photos was drawing her attention. She replied that "they are a little chubbier" and that the head shape was not like those in the eliminated photos. After about ten seconds of silence, Passenger repeatedly tapped the second photo and said, "I keep looking at him." Daukas asked if she meant number two, to which she responded, "Yeah." Daukas asked if she thought he was the man who had leaned out of the side of the car, and Passenger replied, "It looks like him." Daukas then asked her to sign her name on the line under the second photo to indicate her selection. After she had done so, Daukas questioned Passenger on whether she had seen the person she had indicated since the shooting or had any contact from anyone about the situation. After she replied in the negative, Daukas asked if she had any questions for him and then said, "All right, pretty easy, right? . . . We're all done, I have nothing else."

¶16        After holding a *Dessureault* hearing, the superior court denied Clifton's motion to suppress Passenger's pretrial identification. *See Dessureault*, 104 Ariz. at 384 (the trial court must conduct an evidentiary hearing when a pretrial identification is challenged). The court held that the procedure was not suggestive, and therefore did not reach a ruling on the identification's reliability. On appeal, Clifton now argues that Passenger's pretrial identification was not only unduly suggestive but also unreliable and should have been suppressed.

¶17        We review the superior court's ruling on the pretrial identification for abuse of discretion. *State v. Moore*, 222 Ariz. 1, 7, ¶ 17 (2009). We defer to the superior court's findings of fact if those findings are supported by the record and not clearly erroneous, but "the ultimate question of the constitutionality of a pretrial identification" is "a mixed question of law and fact" that we review de novo. *Id.* (citation omitted).

¶18        The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires pretrial identification procedures to be conducted in a fundamentally fair manner that secures the suspect's right to a fair trial. *State v. Lehr*, 201 Ariz. 509, 520, ¶ 46 (2002) (citing *Manson v.*

*Brathwaite*, 432 U.S. 98, 114 (1977)), *supplemented by State v. Lehr*, 205 Ariz. 107 (2003). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). Even an overly suggestive pretrial identification procedure will not bar the admission of the identification if the identification is still reliable in spite of any suggestiveness. *Lehr*, 201 Ariz. at 520, ¶ 46. There is therefore a two-part test for determining admissibility: "(1) whether the method or procedure used was unduly suggestive, and (2) even if unduly suggestive, whether it led to a substantial likelihood of misidentification, i.e., whether it was reliable." *Id.* (citations omitted).

¶19        In determining whether the method or procedure used was so suggestive as to violate a defendant's due process rights, we look to the totality of the circumstances. *State v. Rojo-Valenzuela*, 237 Ariz. 448, 450, ¶ 6 (2015). The allegedly offending circumstances to which Clifton points all concern Daukas' conduct during the procedure, rather than anything about the photo lineup itself: He claims Daukas should have read the admonition aloud to Passenger to "ensure she understood it," and should not have used grayscale photos. He also contends that Daukas interrupted Passenger's deliberation, confirmed her selection before she had definitively decided, and then congratulated her on her choice.

¶20        Despite Clifton's characterization of the procedure, we agree with the superior court: "Here, police randomly placed Defendant's recent photograph in an array of six subjects. [Passenger] in short order eliminated all but two of the persons identified and, after some deliberation and without prompting, identified the Defendant as the person who shot at their automobile." Clifton offers no reason why grayscale photographs are inappropriate, or why reading the admonition aloud to Passenger would have been preferable to allowing her to read it herself to ensure understanding. The photographs were selected based on the "same physical characteristics," so much so that Passenger immediately remarked on how "they all look[ed] the same"—but she nevertheless quickly eliminated four of the six photos. Then, after silently deliberating without interruption, she indicated the photo in position two. Daukas then simply confirmed that number two was her selection and that she believed that was the man who had shot at them. Daukas' comment that it had been "pretty easy, right?" did not seem designed to congratulate Passenger on that selection, but rather to put her at ease in general.

¶21        The superior court did not abuse its discretion in finding that the pretrial identification procedure was not unduly suggestive. *See State v. Taylor*, 27 Ariz. App. 330, 332-33 (App. 1976) (when appellant did not

contend selection of photographs was unduly suggestive and the officer did nothing to suggest which photo was the appellant, the identification procedure was not unduly suggestive). Like the superior court, we therefore need not proceed to analyzing the identification's reliability. *See Perry v. New Hampshire*, 565 U.S. 228, 240-41 (2012) (the due process check for reliability comes into play only when an unnecessarily suggestive identification procedure was used).

## CONCLUSION

**¶22**         For the foregoing reasons, we affirm the decision of the superior court.



AMY M. WOOD • Clerk of the Court
FILED:  AA

10